CALEB R. TROTTER, Cal. Bar No. 305195
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
CTrotter@pacificlegal.org

HALEY S. DUTCH, Colorado Bar No. 58181*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (916) 503-9064
HDutch@pacificlegal.org

\* *Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sean McBride, M.D., and<br><br>G Shellye Horowitz,<br><br>       Plaintiffs,<br><br>  v.<br><br>Randy Hawkins, in his official capacity as President of the Medical Board of California,<br><br>       Defendant. | No._____<br><br>**Complaint for Declaratory and Injunctive Relief** |

Complaint             Case No.: _____

## JURISDICTION

1.    This action arises under the Dormant Commerce Clause of Article I, § 8, cl. 3 of the United States Constitution, the Privileges and Immunities Clause of Article IV, § 2, cl. 1 of the Constitution, the First and Fourteenth Amendments to the Constitution, and 42 U.S.C. § 1983. This Court has jurisdiction over these claims under 28 U.S.C. §§ 1331 (federal question) and 1343(a) (redress for deprivation of civil rights). Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## INTRODUCTION

2.    Plaintiff G Shellye Horowitz suffers from hemophilia A, a bleeding disorder that affects a small number of people in the United States, and even fewer women. People with hemophilia A have difficulty forming blood clots, may have internal bleeding, and often require infusions to enable their blood to clot before even minor medical procedures. Because of this rare condition, Shellye must regularly consult her hemophilia specialist.

3.    Shellye lives in a remote small town in northern coastal California, where there are no specialists that can treat her. Her hemophilia specialist is located in Portland, Oregon. With telehealth, she

can access her needed specialty care without uprooting her life in California. Getting to her specialist in person requires a 14-hour round trip drive.

4.     Without telehealth, patients like Shellye who suffer from rare conditions must either forego specialty, lifesaving care or risk traveling out of state every time an appointment with a national specialist is needed. The burden of frequent travel with rare medical conditions is significant. Telehealth is a lifeline. It allows patients to speak with these unique specialists around the country, especially in situations where time is of the essence. California law, however, makes those remote consultations and check-ins illegal unless the out-of-state physician-specialist first obtains a California medical license.

5.     Plaintiff Sean McBride, M.D., is a nationally renowned radiation oncologist specializing in genitourinary and head and neck cancers. Dr. McBride works at a top specialty cancer hospital in New York.

6.     Dr. McBride has patients across the country, including several in California. He frequently consults with his out-of-state patients virtually, discusses whether they should travel to New York for in-person treatment, and follows up with them upon their return home

1    after treatment. Dr. McBride expects to continue to treat California

2    patients throughout his career, but California's medical licensure rules

3    severely burden his ability to use telehealth to advise and consult with

4    his California patients.

5       7.    Under the United States Constitution's Dormant Commerce

6    Clause and Privileges and Immunities Clause, the government cannot

7    erect such high barriers to the interstate practice of specialized medicine

8    without demonstrating significant local benefits. Further, the First

9    Amendment to the U.S. Constitution prohibits the government from

10   restricting conversations between patients and their physician-

11   specialists based on the content of those discussions. Plaintiffs, who are

12   a California citizen and an out-of-state specialist with patients in

13   California, seek to vindicate their constitutional rights—and ensure they

14   can continue to provide and receive lifesaving care.

15                          **VENUE**

16      8.    Venue in the Eastern District of California is proper because

17   a substantial part of the events giving rise to the claims occurred in the

18   Eastern District of California. 28 U.S.C. § 1391(b)(2).

19

20

9.     Venue in the Sacramento sitting of the Court is proper because this action arises in Sacramento County where a substantial part of the events giving rise to the claims occurred. *See* L.R. 120(d).

## PARTIES

10.     Plaintiff Sean McBride, M.D., is a United States citizen and resident of New York. Dr. McBride is a highly regarded, board-certified radiation oncologist at a top specialty cancer hospital in New York. With a practice specializing in treating complex cancers using sophisticated radiation techniques, Dr. McBride sees patients from around the country.

11.     Plaintiff G Shellye Horowitz is a United States citizen and resident of California.

12.     Defendant Randy Hawkins, M.D., is the President of the Medical Board of California, which is responsible for licensing and disciplining medical doctors. *See* Cal. Bus. & Prof. Code § 2220. Dr. Hawkins is sued in his official capacity.

## FACTUAL ALLEGATIONS

### California's Telehealth Licensure Rule

13.     California law mandates that "any person who practices . . . any system or mode of treating the sick or afflicted in this state . . . without having at the time of doing so a valid, unrevoked, or

1    unsuspended certificate . . . is guilty of a public offense, punishable by a

2    fine not exceeding ten thousand dollars ($10,000), [or] by imprisonment."

3    Cal. Bus. & Prof. Code § 2052(a).

4        14.    The practice of medicine in California includes engaging in

5    telehealth. "Telehealth" is defined as "the mode of delivering health care

6    services and public health via information and communication

7    technologies to facilitate the diagnosis, consultation, treatment,

8    education, care management, and self-management of a patient's health

9    care." Cal. Bus. & Prof. Code § 2290.5(a)(6).

10       15.    Telehealth is an in-demand tool—especially after the COVID-

11   19 pandemic—because it conveniently "facilitates patient self-

12   management and caregiver support for patients and includes

13   synchronous interactions and asynchronous store and forward transfers."

14   Cal. Bus. & Prof. Code § 2290.5(a)(6).

15       16.  "Synchronous interactions" are "a real-time interaction

16   between a patient and a health care provider located at a distant site,"

17   Cal. Bus. & Prof. Code § 2290.5(a)(5), and "can be either an audio-only

18

19

20

synchronous interaction or a video synchronous interaction." Telehealth Definitions, California Department of Health Care Services.[1]

17.    An "audio-only synchronous interaction" is "[a] real-time interaction between a patient and health care provider that is conducted solely via audio (e.g., telephone, internet call without video)." *Id.*

18.    A "video synchronous interaction" is "[a] real-time interaction between a patient and health care provider that is conducted via an interactive technology platform that includes both audio and visual capabilities." *Id.*

19.    Should a physician use telehealth to consult with or advise a patient in California without holding an active California medical license, he or she is guilty of a "public offense," punishable by up to a year of imprisonment and a fine up to $10,000. Cal. Bus. & Prof. Code § 2052(a).

20.    The licensure rule and accompanying penalties for violations do not apply when an out-of-state physician uses telehealth technology to consult directly with a physician licensed in California. Cal. Bus. & Prof. Code § 2060.

---

[1] *Available at* https://www.dhcs.ca.gov/provgovpart/Pages/telehealthdefinitions.aspx.

## Telehealth for Specialists Is Lifesaving

21.    When patients are referred to physician-specialists like Dr. McBride, it is typically because the patient's local doctors lack the expertise, experience, or resources to diagnose or treat the patient's unique condition.

22.    After a patient is initially referred to a specialist, the specialist typically schedules a consultation to confirm the diagnosis and determine whether he or she can treat the patient. The specialist must then make specific, nuanced treatment recommendations.

23.    California's telehealth licensure rule means that patients seeking a consultation with an out-of-state specialist not licensed in California must decide whether to incur the cost of traveling out of state to speak with a national specialist about their condition and options for treatment.

24.    Without the ability to consult before traveling, patients cannot know whether the specialist will be able to treat them or offer novel clinical trials particular to their condition. As a result, some patients are unable, or unwilling, to travel and therefore never receive treatment from or learn about trials led by specialists like Dr. McBride.

25.    For those patients who do travel and consult with out-of-state specialists and ultimately undergo treatment, ongoing follow-up care is critical. While some patients need only simple (but important) check-ups or advice, others require periodic and systematic reviews.

26.    For patients with uncurable, rare conditions like Shellye, ongoing advice and consultation is needed to assist her with managing her rare bleeding disorder.

27.    With the use of telehealth, it is no longer necessary for patients to have to incur costly and time-consuming travel to consult with specialists. Patients can forward their medical records for specialized expert review, and upon meeting for a consultation using telehealth, they can easily discuss treatment options.

28.    If it is determined via telehealth that a specialist like Dr. McBride cannot treat a patient, it saves the patient the time and expense of travel.

29.    Telehealth also saves patients from needing to travel for follow-up care. Telehealth is used to monitor a patient's progress and any future developments without the patient needing to travel for brief appointments. Objective medical data (e.g., blood tests, imaging, or labs)

can be obtained locally and then reviewed and interpreted during telehealth visits by out-of-state specialists.

30.    Dr. McBride does not use telehealth to directly treat patients. Radiation treatments performed by Dr. McBride are intensive, multi-day regimens conducted in person at his New York hospital.

*G Shellye Horowitz*

31.    Plaintiff Shellye Horowitz has hemophilia A, a rare bleeding disorder that primarily affects males and is underdiagnosed in females. In fact, it is estimated that only about 1,500 females with hemophilia A are seen at federally funded hemophilia treatment centers, compared to about 20,000 males.

32.    Because hemophilia A so rarely affects women, Shellye was 45 before she was diagnosed with hemophilia. After her diagnosis, Shellye's body developed an immune response to her medication, making it less effective at controlling her bleeding. Due to complicating factors making her condition even more rare, it took an additional two years for Shellye to obtain effective treatment.

33.    In the interim, Shellye underwent an 8-hour surgery and had bleeding complications for over 30 days, requiring 43 IV infusions to control the bleeding.

34.    After she was accurately diagnosed with hemophilia, it remained difficult for Shellye to find a qualified doctor with expertise in caring for women with hemophilia A.

35.    There are no hemophilia specialists near Shellye's remote home. She sought out the closest specialist five hours away in the Bay Area, but after having a negative surgical experience there she began looking for a hemophilia treatment center with a specialized clinic to treat women with bleeding disorders.

36.    Currently, there are only 10 federally funded hemophilia treatment centers in the United States with specialized interdisciplinary clinics to specifically address the needs of adult women with hemophilia A and other bleeding disorders.

37.    There is a hemophilia treatment center in southern California with a women's clinic, but it takes an eleven-hour drive for Shellye to reach. An in-person visit to establish care, and yearly visits necessary for continuity of care, make this center infeasible for Shellye due to the length of travel and time off work needed to seek treatment there, even if some telehealth visits were available.

38.    While attending the first national conference for women with hemophilia in 2018, Shellye was referred to a hematologist in Portland,

Oregon. That hematologist worked at a hemophilia treatment center with an established multi-disciplinary clinic for treating women and girls with bleeding disorders—the first such center on the west coast.

39.    The care that Shellye receives from her Oregon hemophilia treatment center has been essential. Her annual bleed rate has decreased and her quality of life has dramatically increased. She has even moved all of her other specialty medical care to the same Oregon hospital system as her hemophilia center to ease the burden of care coordination between all of her doctors.

40.    Shellye's condition is currently well-controlled, but she still requires frequent consultation with her specialists in Oregon. Because of the rarity of her condition, along with her complicating factors that require additional monitoring, she seeks out consultations with her hemophilia specialist as often as once a month to help her best manage her health.

41.    Hemophilia A can make minor medical procedures, regular exercise, and day-to-day activities dangerous, because any trauma may set off bleeding that is difficult to stop. These incidents are unpredictable and must be dealt with in a timely manner. It is vital that Shellye be able to access specialty care on demand during emergencies and to prevent

bleeding. For example, she may need guidance regarding IV infusions before routine dental work, immunizations, or recreational activities, such as dance classes.

42. The availability of telehealth makes it possible for Shellye to be cared for by the most qualified specialists for her rare condition while remaining at her distant home. Increasingly, her Oregon specialists are unable or unwilling to speak with her over the phone due to concerns about California's telehealth licensure rule. If she is required to travel to Oregon every time she needs to consult with her specialists, she would have to decide between disrupting her life, missing multiple days of work, and spending considerable time and money to maintain her life-changing care or return to the days when she was not properly cared for.

### California's Telehealth Licensure Rule
### Burdens Interstate Specialty Medical Practice

*Burdens on Physician-Specialists*

43. The initial licensure process for physicians in California includes: a $674 application fee, a $1,176 initial licensing fee, a background check and fingerprints, and significant documentation. The Medical Board recommends that applicants allot six months for the licensing process.

44. California does not participate in the Interstate Medical Licensure Compact, or have reciprocity agreements with other states, which could somewhat simplify the licensure process for physicians licensed in other states.

45. Maintaining licenses in multiple states is a significant burden for doctors. Monitoring renewal dates and fees, state-specific continuing education requirements, and other state-specific requirements create administrative barriers that prevent them from seeking licensure in all states where they have patients.

46. For specialists like Dr. McBride, who have a national practice and only occasionally consult with or treat patients from California, the costs of being licensed in California are disproportionate to the volume of patients they would treat there.

47. Specialists with national practices like Dr. McBride do not know in advance where a potential patient will be located. As patients often seek consultations within days of an initial diagnosis, should a specialist like Dr. McBride first need to become licensed in California, the process would preclude him from consulting with California patients.

48. Dr. McBride's patients also travel outside their home states for work or vacation. Should a current patient travel to California,

Dr. McBride will be unable to see that patient via telehealth unless he becomes licensed in California.

49. Without a California license, Dr. McBride must decide whether to risk criminal and civil liability for having conversations using telehealth with his California patients.

50. Any enforcement action taken in California against Dr. McBride for seeing a California patient using telehealth without first being licensed in California could also result in administrative penalties in states in which Dr. McBride is licensed.

51. Many specialists, like Dr. McBride, believe it is their ethical duty to maintain ongoing care for their patients. California's telehealth licensure rule makes it illegal for Dr. McBride to satisfy that ethical duty for his California patients using telehealth.

52. Being unable to use telehealth to consult with potential California patients and follow-up with existing California patients after treatment, as Dr. McBride intends to do, will mean specialists with national practices like Dr. McBride consulting with and treating fewer patients in California who need their special expertise.

53. California's telehealth rules also significantly hamper critical research by specialized experts like Dr. McBride. Many cancer patients

seeking specialty care are eligible for participation in clinical trials that are oftentimes open only at select hospitals. The inability to use telehealth to speak with patients to determine their eligibility for such trials and to then follow up with patients after receiving treatment on a trial decreases the chances that the trial will succeed and fundamentally limits patients' access to potentially life-saving treatments.

*Burdens on Patients*

54.    Without convenient access to out-of-state specialists, patients like Shellye Horowitz can only avail themselves of local expertise and resources. Forced reliance on limited local expertise and resources can have dire consequences.

55.    There is no physician with expertise in hemophilia located near Shellye. Management of her rare condition was only understood and successful after she was referred to her Oregon specialist.

56.    In the critical days following initial diagnosis with rare cancers and diseases, telehealth allows patients and their families to consult with multiple specialists. These consultations allow them to obtain expert opinions, uncover unique options, and have an expert's review of initial treatment plans, regardless of location or budget.

57.     Without telehealth, the cost and time commitment required to physically travel to each specialist's office for consultation would preclude most patients from obtaining critical care and understanding various treatment options. Moreover, without the opportunity for an initial consultation, a patient's health may preclude her from traveling even if she has the financial resources.

58.     After a patient returns home from treatment, follow-up care is often necessary. For patients like Shellye, follow-up consultations with specialists are necessary nearly every time she seeks routine medical care. Telehealth allows her out-of-state specialists to review and communicate quickly and efficiently with her.

59.     If Shellye is unable to use telehealth for follow-up care, the burden of frequent travel may prevent her from receiving that information and care.

60.     Patients of Dr. McBride often have questions or concerns about their progress during recovery, and many require perpetual annual reviews to monitor for recurrence of cancers. If they are unable to use telehealth to discuss those questions and concerns, the patient may be forced to seek out a local doctor lacking the necessary expertise and personal context.

61.    Patients of Dr. McBride often travel for work or vacation. Should a patient need an appointment while traveling in California, the state's telehealth licensure rule prevents them from receiving that critical care from him.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violation of Commerce Clause's Protection of Interstate Practice of Medicine

62.    Plaintiffs reallege and incorporate by reference all allegations contained in the previous paragraphs.

63.    The Commerce Clause of the United States Constitution, Article I, § 8, cl. 3, gives Congress the exclusive power to regulate interstate commerce. This power restrains the legislative power of the states even when Congress has not expressly exercised that power—a doctrine known as the "dormant" Commerce Clause.

64.    Under the Dormant Commerce Clause, states are prohibited from enacting laws that discriminate against interstate commerce or excessively burden interstate commerce in relation to any putative local benefits.

65. California's telehealth licensure rule, Cal. Bus. & Prof. Code §§ 2052(a); 2290.5(a)(3)(A), prohibits out-of-state specialists like Plaintiff Dr. McBride from using telehealth to consult with potential patients in California or to check in with current patients in California following specialized treatment, unless the specialists first undergo the burdensome process of becoming licensed in California.

66. The telehealth licensure rule also directly regulates interstate commerce by restricting the use of telehealth across state lines.

67. The telehealth licensure rule restricts and substantially burdens the practice of medicine across state lines by prohibiting out-of-state specialists from consulting and following up with California patients via telehealth unless they first obtain a California medical license.

68. The telehealth licensure rule discriminates against and places a substantial burden on the interstate practice of specialty medicine via telehealth provided to California patients by out-of-state specialists that is not justified by any putative local benefit.

69. Shielding in-state California physicians from competing with out-of-state specialists is not a legitimate local benefit. Nor is that interest furthered by the telehealth licensure rule, as the most likely

result of the rule is patients being denied access to specialty care available outside of California.

70.    Plaintiffs have suffered and will continue to suffer substantial and irreparable harm unless the telehealth licensure rule is declared unlawful and enjoined by this Court as applied to licensed out-of-state specialists.

## SECOND CLAIM FOR RELIEF

### Violation of Privileges and Immunities Clause's Protection of Interstate Practice of Medicine

71.    Plaintiffs reallege and incorporate by reference all allegations contained in the previous paragraphs.

72.    The Privileges and Immunities Clause of Article IV, § 2, cl. 1 of the United States Constitution establishes that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Among the rights protected by the Clause is the right to practice an occupation.

73.    The telehealth licensure rule prohibits out-of-state specialists like Dr. McBride from practicing medicine across state lines using telehealth to consult with potential patients in California and to check in with their current patients in California following treatment.

74.    The most evident purpose in Defendant's continuing enforcement of the telehealth licensure rule as applied to licensed out-of-state physician-specialists is to protect in-state physicians from competing with out-of-state specialists.

75.    The telehealth licensure rule has discriminatory effects against out-of-state specialists with national practices, like Plaintiff Dr. McBride. For example, the burdens of obtaining and maintaining a California medical license, in addition to a specialist's primary license, are prohibitive for out-of-state specialists who only occasionally consult and follow up with patients in California.

76.    The telehealth licensure rule is not supported by a substantial reason for its discriminatory effects on out-of-state specialists, nor does the discrimination bear a substantial relationship to any legitimate state objective.

77.    The requirements for California licensure mirror, in all material respects, the requirements for licensure in New York.

78.    Less restrictive alternatives to licensure are available to regulate telehealth in California by out-of-state specialists. During and after the COVID-19 pandemic, for example, several states created telehealth-specific registration mechanisms that were short of full

1    licensure to significantly ease burdens on out-of-state physicians already

2    licensed in their home states, and no known harms have befallen patients

3    due to these relaxed processes and requirements.

4        79.    Plaintiffs have suffered and will continue to suffer substantial

5    and irreparable harm unless the telehealth licensure rule is declared

6    unlawful and enjoined by this Court as applied to licensed out-of-state

7    specialists.

8                        **THIRD CLAIM FOR RELIEF**

9              **Violation of Plaintiffs' First Amendment**
               **Right to Freedom of Speech**

10       80.    Plaintiffs reallege and incorporate by reference all allegations

11   above.

12       81.    The First Amendment to the United States Constitution, as

13   applied to the states through the Fourteenth Amendment, protects the

14   ability of physicians and patients to discuss potential treatment and to

15   check in after treatment.

16       82.    Plaintiff Dr. McBride has the right to consult with potential

17   patients in California to determine whether he can treat the patient, and

18   to have periodic conversations with patients in California following in-

19   person treatment.

20

---

83.     Plaintiff Horowitz has the right to engage in conversations with her out-of-state specialists concerning her rare bleeding disorder and its effect on her health.

84.     The telehealth licensure rule restricts Dr. McBride's ability to speak with potential California patients who may require his expert care.

85.     The telehealth licensure rule likewise restricts the ability of Plaintiff Horowitz to use telehealth to share and receive information from out-of-state specialists to understand all of her options and to discuss progress and concerns for the management of her rare condition.

86.     Restricting Plaintiff Dr. McBride from using telehealth to discuss new cancer diagnoses, tailored treatment options, and the after-effects of any therapy administered with potential and existing patients in California burdens his right to free speech.

87.     Restricting Plaintiff Horowitz from using telehealth to share information with and receive information from out-of-state specialists about her ongoing care burdens her right to free speech.

88.     The telehealth licensure rule requires government officials to thoroughly review the content of a physician's conversation with a patient to determine whether the conversation facilitated the diagnosis, consultation, treatment, education, care management, and self-

management of a patient's health care. The rule is a content-based restriction on Plaintiffs' freedom of speech because the licensure rule is only applied if the conversation includes topics related to a particular patient's health care.

89. The telehealth licensure rule is also a speaker-based restriction on Plaintiffs' freedom of speech because its restrictions apply based on the physician's licensure.

90. The telehealth licensure rule is not sufficiently tailored to serve a compelling government interest.

91. By preventing Plaintiff Dr. McBride from using telehealth to consult with potential patients in California and check in with existing patients in California, Defendant maintains and actively enforces a set of laws, practices, policies, and procedures under color of state law that deprives Plaintiff of his right to free speech, in violation of the First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment and 42 U.S.C. § 1983.

92. By preventing Plaintiff Horowitz from using telehealth to talk to her out-of-state specialists about her ongoing care for her rare bleeding disorder, Defendant maintains and actively enforces a set of laws, practices, policies, and procedures under color of state law that deprives

Plaintiff of her right to free speech, in violation of the First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment and 42 U.S.C. § 1983.

93.   Plaintiffs have no adequate remedy at law to compensate for the loss of their freedom of speech and will suffer irreparable injury absent an injunction prohibiting Defendant's enforcement of the telehealth licensure rule as applied to licensed out-of-state physician-specialists.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A.   A declaration that Cal. Bus. & Prof. Code § 2052(a), as applied to licensed out-of-state specialists engaging in telehealth like Dr. McBride, violates the Dormant Commerce Clause and Privileges and Immunities Clause of the U.S. Constitution, as well as the First and Fourteenth Amendments to the U.S. Constitution;

B.   A declaration that Cal. Bus. & Prof. Code § 2052(a), as applied to Plaintiff Horowitz, violates the Dormant Commerce Clause and the First and Fourteenth Amendments;

C.   A permanent injunction restraining Defendant and Defendant's officers, agents, affiliates, servants, successors, employees,

and all other persons in active concert or participation with Defendant from enforcing Cal. Bus. & Prof. Code § 2052(a) against Plaintiffs;

D.    An award of attorney fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

E.    Any further relief as the Court may deem just, necessary, or proper.

DATED:  May 16, 2024.

Respectfully submitted,

_s/ Caleb R. Trotter_____
CALEB R. TROTTER
Cal. Bar No. 305195
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
CTrotter@pacificlegal.org

HALEY S. DUTCH, Colo. Bar No. 58181*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (916) 503-9064
HDutch@pacificlegal.org

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs*