UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sean McBride, et al., | No. 2:24-cv-01394-KJM-AC |
| Plaintiffs, | ORDER |
| v. | |
| Kristina Lawson, | |
| Defendant. | |

Plaintiffs Dr. Sean McBride, M.D., and G. Shellye Horowitz have brought this constitutional challenge against a California law requiring medical doctors obtain California medical licenses before treating patients in California, even if the treatment is provided over the phone or in a video call. As explained in this order, plaintiffs' allegations do not make out plausible claims, so the complaint is **dismissed with leave to amend in part**.

I.  **BACKGROUND**

Anyone who practices medicine in California without a medical license faces criminal liability, which could mean as much as a year in prison and a fine of up to $10,000. *See* Cal. Bus. & Prof. Code § 2052(a). That is true as well for doctors with licenses from other states. If they treat patients who are in California at the time of that treatment—"California patients" in this order—then they must satisfy California's licensing requirements, which in broad strokes require proof of postgraduate training, successful completion of a written exam and other background

1

qualifications. *See id.* §§ 2081, 2135, 2135.5. In addition, applicants must pay a fee, and if they are qualified and receive a license, they must also pay an initial licensing fee and renewal fees every other year. *See id.* § 2435. Finally, licensed physicians must keep up with continuing medical education requirements set by the state's medical board. *See id.* § 2190.

These same requirements apply to all types of treatment, whether in person, by phone or over video. *See id.* § 2290.5(e), (g). Remote or virtual treatment is in fact specifically defined in the state's laws and regulations as "telehealth" or "telemedicine." *See id.* § 2290.5(a)(1), (5), (6). As a result, any doctors who consult with California patients by phone or video are considered to be treating patients in California and must maintain a California license or otherwise risk criminal liability. This is true no matter whether the doctors are themselves in California or another state at the time of treatment.

These rules can create problems for patients such as Horowitz. Assuming at this stage the complaint's allegations are true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), Horowitz has been diagnosed with hemophilia A, a rare disorder that affects only a small number of people in the United States, and an even smaller proportion of women. Compl. ¶ 31, ECF No. 1. There are no specialists who can treat her in the small town where she lives. *Id.* ¶ 35. She attempted to find the care she needed in California for many years, but without success, so she now sees specialists at a hospital in Portland, Oregon. *Id.* ¶¶ 34–35, 38–40. She still requires regular consultations with her specialists, however, and Portland is more than seven hours from her home by car. *See id.* ¶¶ 3, 40. It would be much cheaper and more convenient for her to see her doctor by phone or in a video call from her home in California than in person in Oregon. *See id.* ¶ 3. But as the law currently stands, unless her specialists in Oregon obtain a California license, they would risk criminal liability for treating her under the statutes summarized above.

California's licensing rules can also complicate the medical practices of out-of-state specialists who treat patients in California. Dr. McBride, for example, is an oncologist who works at a specialty cancer hospital in New York and is licensed in New York. *Id.* ¶ 5. He treats patients from many states, including California. *Id.* ¶ 6. Sometimes patients must be treated on location in New York, such as those who receive intensive, multi-day radiation treatment, but

initial consultations and follow-up visits often can be conducted remotely. *See id.* ¶¶ 6, 30. For California patients with limited time or means, travel to New York or to another place outside California can be very difficult, even cost-prohibitive, especially when it comes to preparatory visits and initial consultations, which might mean patients settle for less than the best available care. *See id.* ¶¶ 56–60. Unless doctors like McBride obtain a California license, they must ask all of their California patients to leave California for treatment, which could effectively force out-of-state specialists to choose between accepting fewer California patients or spending time and money to maintain a California license. *See id.* ¶¶ 48–52. The plaintiffs allege that if specialists are expected to maintain many licenses in many states, it could impose a significant administrative burden. *See id.* ¶ 45.

McBride and Horowitz contend in this case that California's medical licensing requirements are not only costly and unfair, but also unconstitutional. First, they allege California's licensing rules violate the constitutional principle that states may not discriminate against out-of-state commerce, explaining that California's rules effectively impose an extra cost on out-of-state physicians who provide care to California patients. *See id.* ¶ 63 (citing U.S. Const. art. I, § 8, cl. 3). Second, McBride and Horowitz allege for similar reasons that California has violated the Privileges and Immunities Clause, which guarantees that "Citizens of each state shall be entitled to all Privileges and Immunities of Citizens in the several states." *Id.* ¶ 72 (quoting U.S. Const. art. IV, § 2, cl. 1). Third, they allege California's licensing rule unconstitutionally prevents doctors from speaking with patients about their treatment in violation of the First Amendment's prohibition against laws "abridging the freedom of speech." *See id.* ¶¶ 80–93. The complaint names one defendant, the President of the Medical Board of California, in her official capacity. *See id.* ¶ 12.[1] The state Medical Board is the body responsible for licensing and disciplining medical doctors. *See id.* (citing Cal. Bus. & Prof. Code § 2220).

---

[1] The complaint names Randy Hawkins as the president of the medical board. *See id.* The court takes judicial notice that Kristina D. Lawson became board president on June 7, 2024. *See* Fed. R. Evid. 201(b); Medical Board of California, "News Release: Medical Board of California Selects Kristina D. Lawson, J.D. as Board President" (June 7, 2024), https://www.mbc.ca.gov/News/News-Releases/2024-06-07.aspx (visited Nov. 15, 2024). Lawson

3

The president of the medical board moves to dismiss the complaint for failure to state a claim under Rule 12(b)(6). *See generally* Mot., ECF No. 10. McBride and Horowitz oppose the motion. *See generally* Opp'n, ECF No. 11. While briefing was underway, the Goldwater Institute requested permission to file an amicus curiae brief in support of McBride and Horowitz. *See* Amicus Mot., ECF No. 12; Amicus Br., ECF No. 12-1. The state does not oppose that request, which the court grants. *See Cmty. Ass'n for Restoration of Env't* (*CARE*) v. *DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999) ("An amicus brief should normally be allowed . . . when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."). Briefing is now complete. *See generally* Reply, ECF No. 13. The court took the matter under submission after a hearing on September 13, 2024. *See* Mins., ECF No. 16. Haley Dutch and Caleb Trotter appeared at hearing for McBride and Horowitz, and Kevin Quade appeared for the defense. *Id.*

After the matter was submitted, plaintiffs filed a notice of supplemental authority, citing the Fifth Circuit's intervening opinion in *Hines v. Purdue*, 117 F.4th 769 (5th Cir. 2024). *See* Not. Suppl. Auth., ECF No. 18. Absent any objection from the state, the court has considered that opinion for its persuasive but not precedential value, as discussed below. *See Hart v. Massanari*, 266 F.3d 1155, 1172–73 (9th Cir. 2001) (summarizing respective roles and rules of binding and persuasive authority in federal courts).

## II.   DISCUSSION

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In response, the court begins by assuming the complaint's factual allegations are true, but not its legal conclusions. *Iqbal*, 556 U.S. at 678–79 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court then determines whether those factual allegations "plausibly give rise to an entitlement to relief" under Rule 8. *Id.* at 679.

At the outset, it is worth emphasizing what this case is not about. The question is not whether California's laws optimally balance the interests of patients and their doctors. It is not

---

was substituted automatically in Hawkins's place when she took office. *See* Fed. R. Civ. P. 25(d).

4

whether the state's laws are faulty or out of date. It is whether the plaintiffs have made out any plausible legal claims based on the specific constitutional clauses they cite in their complaint.

### A.      Commerce Clause

The plaintiffs' first claim rests on the Commerce Clause of the U.S. Constitution, which gives Congress power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has long interpreted the Commerce Clause as not only granting that affirmative power, but as also impliedly forbidding "certain state economic regulations." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (alterations omitted) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). States may not enforce laws "driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (alterations omitted) (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)).

Cases about this "dormant" or "negative" aspect of the Commerce Clause generally fall into two categories. First, if a state law "directly regulates or discriminates against interstate commerce," or when the state law effectively favors "in-state economic interests over out-of-state interests," then the Supreme Court has "generally struck down the statute without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578–79 (1986). Second, if a state statute "has only indirect effects on interstate commerce and regulates evenhandedly," then the Supreme Court "has examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). But the line between these categories can be a fuzzy one. *See Nat'l Pork*, 598 U.S. at 377. Sometimes it is difficult to say whether the "practical effects" of an apparently evenhanded statute are problematic because they are burdensome or whether those effects reveal a hidden "discriminatory purpose." *Id.*

McBride and Horowitz allege California's medical licensing laws violate the Commerce Clause in both respects. They allege those laws are discriminatory and impose indirect but unjustified burdens on interstate commerce.

1. **Discriminatory Laws**

In the first category, the state's licensing system is not a discriminatory regulation, i.e., it is not among those laws that are "virtually per se invalid" and are usually "struck down . . . without further inquiry." *Brown-Forman*, 476 U.S. at 579. In Commerce Clause cases, "discrimination" has a specific meaning: "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Ore. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1993)). It follows from this definition that a statute does not "discriminate" for purposes of the Commerce Clause if it imposes the same burdens on everyone, "whether they are based in-state or out-of-state." *Ward v. United Airlines, Inc.*, 986 F.3d 1234, 1240 (9th Cir. 2021). A law that treats everyone "'exactly the same' does not discriminate against interstate commerce." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) (quoting *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007)).

California's licensing rules are the same for all doctors, no matter where they live, no matter where they were trained, no matter where they practice, no matter what specialty they may have. All doctors must obtain a license from the state's medical board before they treat California patients. The rules are evenhanded. They do not "discriminate" in the way necessary for plaintiff's claims to survive.

Similarly neutral laws have withstood Commerce Clause challenges over the years, despite a challenger's claim the laws were discriminatory and invalid per se. For example, in *Ward*, an airline alleged California wage and hour laws were discriminatory. *See* 986 F.3d at 1239. The state law in question was a decision by California's Supreme Court, which clarified when employees who do not spend the majority of their time in any one state are nonetheless "based in" California, and, by extension, when their employers must comply with California's rules about wage statements. *Id.* at 1238. The rule was the same for every employer and employee: if employees perform "at least some work in California," and if California is the "physical location" where they present themselves to begin work, then the employee is based in

1  California. *Id.* The Ninth Circuit was able to "quickly dismiss any suggestion" that this rule was
2  discriminatory. *Id.* at 1239. The rule imposed "burdens on private employers evenhandedly,
3  whether they are based in-state or out-of-state." *Id.* at 1240. The airline in question was
4  incorporated in Delaware and had its headquarters in Illinois, but the burdens would have been
5  the same even if it were based in California. *Id.* The same could be said of a doctor like McBride
6  or Horowitz's specialists in Oregon: no matter where they live—California, Oregon or New
7  York—they must obtain a California license before treating patients in California.

8        The Ninth Circuit's opinion in *International Franchise Association, Inc. v. City of Seattle*,
9  is equally compelling. *See generally* 803 F.3d 389 (9th Cir. 2015). In that case, the City of
10 Seattle had raised the minimum wage. *See id.* at 398. But rather than increasing the minimum
11 wage immediately for all employers, the city created two "schedules," one for large employers
12 and one for small employers. *See id.* The minimum wage increased more quickly in the schedule
13 for large employers, and the city put franchises in that schedule if they were part of a large
14 franchisee network. *See id.* The plaintiff, an association of franchises, alleged the differential
15 scheduling was discriminatory, but the Ninth Circuit disagreed. *See id.* at 400–03. As in *Ward*,
16 the rule was the same for everyone: "A franchisee that sources its inputs from Washington and
17 serves local Seattle residents is treated just like a franchisee—or a non-franchisee, for that
18 matter—that sources its inputs from Oregon and serves out-of-state tourists." *Id.* at 400. The
19 same is true of California's licensing rule. A doctor who treats California patients out of an office
20 in New York City is treated just like a doctor who treats California patients out of an office in
21 Sacramento. Both must obtain a California license.

22       McBride and Horowitz argue in opposition that a law can be unconstitutionally
23 discriminatory if it gives local goods a greater share of the market at the expense of goods from
24 outside the state. *See* Opp'n at 3. They suggest this case is an example of a law with that effect:
25 the state's licensing rules can force its citizens "to seek less qualified medical advice in state,
26 when better, more specialized advice is available out of state," and doctors who live and practice
27 outside California must obtain a California license in addition to their out-of-state license. *See id.*
28 This may be so, but it does not show California's law is discriminatory. Evenhanded laws are not

discriminatory simply because they have an outsized effect on people from other states, as illustrated by *Ward* and *International Franchises Association*, summarized above, and the Supreme Court's decisions as well. *See, e.g.*, *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978) ("The fact that the burden of a state regulation falls on some interstate [actors] does not, by itself, establish a claim of discrimination against interstate commerce.").

McBride and Horowitz contend similarly that California's licensing system is discriminatory because its burdens fall "solely" on people from other states. *See* Opp'n at 5. But again, that does not show California has discriminated against out-of-state commerce. Maryland once passed a statute that barred all petroleum refiners and producers from operating retail gas stations within its borders. *Exxon*, 437 U.S. at 119–20. But the state's entire gas supply came from outside the state, *see id.* at 125, so at most its law was forcing an unpleasant choice upon out-of-state suppliers: divest from your production capacities or withdraw from the local retail market, *see Nat'l Pork*, 598 U.S. at 383–84 (opinion of Gorsuch, J., joined by Thomas, Sotomayor and Kagan, JJ.) (citing *Exxon*, 437 U.S. at 124–28). The law was "burdensome," even "prohibitive." *Exxon*, 437 U.S. at 127–28. The law may even have been quite harmful to "the consuming public." *Id.* at 128. But it was not unconstitutionally discriminatory. *See id.*

In this case, then, out-of-state specialists might very well feel the burden of California's licensing requirement most heavily, or even solely. California patients also may be worse off, especially if an out-of-state specialist has no California peers with equivalent expertise and skill. But because the state's licensing rules are the same for everyone, they are not unconstitutionally discriminatory under the Commerce Clause.

McBride and Horowitz rely primarily on the Supreme Court's decision in *Hunt v. Washington State Apple Advertising Commission* to press the opposite conclusion. *See* Opp'n at 3–4 (citing 432 U.S. 333 (1977)). *Hunt* is a decision on the fuzzy border between the two basic categories introduced above, i.e., the category of discriminatory state regulations that are "virtually per se invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach." *Brown-Forman*, 476 U.S. at 579 (citing 397 U.S. 137). Even though the Supreme Court decided in *Hunt* that the law was discriminatory based on its

effects, the Court did not strike the law down "without further inquiry." *Id*. at 579. Instead, the Court cited *Pike* and weighed its "local benefits" against its burdens on interstate commerce. *See* 432 U.S. at 353–54.

In any event, no matter what category is a better fit for *Hunt*, "the critical consideration" is the same: assessing "the overall effect of the statute on local and interstate activity." *Brown-Forman*, 476 U.S. at 579. In *Hunt*, the discriminatory effects of the challenged state law were clear. In this case they are not. *Hunt* was a case about apples. Washington state, the nation's largest producer of apples, had devised an apple grading standard that had come to dominate the industry. *See* 432 U.S. at 336. Members of the apple trade preferred Washington's standard even to that of the United States Department of Agriculture. *See id.* North Carolina, however, had adopted a "regulation, unique in the 50 states, which in effect required all closed containers of apples shipped into or sold in the State to display either the applicable USDA grade or none at all." *Id.* at 337. In other words, North Carolina had barred anyone from importing apples that bore the Washington grade. *See id.* The Supreme Court described three ways in which this bar was discriminatory. First, it raised the cost of doing business in North Carolina, but only for out-of-state growers. *See id.* at 350–51. Second, North Carolina had stripped a hard-won advantage from Washington growers by barring them from relying on their superior grading system. *See id.* Third, North Carolina had elevated its own producers by forcing everyone to use the USDA grading system, widely regarded as inferior, or none at all. *See id.* at 351–52.

California's medical licensing rules impose no similar costs and confer no similar advantages. There is no indication any particular licensing system has come to be accepted as superior to all others. No state's medical board has fought to secure an advantage as the definitive authority on medical qualification. California has not promoted its own physicians by elevating its own grading system and its own physicians' qualifications. All physicians, whether based in California or elsewhere, must pay the licensing fees to treat California patients. True enough, doctors from other states must secure a California license in addition to their own state's licenses, but the increased cost is a function of the doctor's decision to practice in multiple states, not California's decision to require a license for practice here.

## 2. Laws Imposing Excessive Burdens on Interstate Commerce

As for the second category of state laws—those that are evenhanded but impose excessive and unjustified burdens on interstate commerce—the Ninth Circuit has held that plaintiffs can withstand a motion to dismiss only by plausibly alleging the law "places a significant burden on interstate commerce." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1032 (9th Cir. 2021) (quoting *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 445 (9th Cir. 2019)). The Supreme Court more recently affirmed that holding in a divided series of interlocking opinions. 598 U.S. 356. Just about five months ago, a Ninth Circuit panel held the circuit's affirmed opinion remains binding. *Iowa Pork Producers Ass'n v. Bonta*, No. 22-55336, 2024 WL 3158532, at *3 (9th Cir. June 25, 2024) (unpublished). This is because the Supreme Court had not agreed on "a single rationale for affirming," and because none of the competing rationales was "a logical subset of the other." *Id.* (quoting *United States v. Davis*, 825 F.3d 1014, 1022 (9th Cir. 2016) (en banc)). That conclusion is not binding, as it was expressed in an unpublished memorandum disposition, but it rests on a persuasive analysis of the Supreme Court's opinion and the Circuit's longstanding cases in any event. The question is, therefore, whether McBride and Horowitz have plausibly alleged California's law places a "significant burden" on interstate commerce.

The Ninth Circuit often has been asked to decide whether a plaintiff has carried that burden, and "only in rare cases" has it found plaintiffs have done so. *Nat'l Pork*, 6 F.4th at 1032. It also has made clear "laws that increase compliance costs, without more, do not constitute a significant burden on interstate commerce." *Id.* In other words, "[t]he mere fact that a firm engaged in interstate commerce will face increased costs as a result of complying with state regulations does not, on its own, suffice to establish a substantial burden on interstate commerce." *Id.* (quoting *Ward*, 986 F.3d at 1241–42). This is so even if the challenged state law imposes "heavy burdens on some out-of-state sellers." *Id.*

The allegations in McBride and Horowitz's complaint fit this latter description: they allege doctors in other states who practice in California face additional compliance costs, such as licensing fees and continuing medical education requirements. Similar claims based on similar allegations repeatedly have fallen short. *See, e.g., Id.*, 6 F.4th at 1032–33 (regulations imposing

10

higher costs on pork production); *Ward*, 986 F.3d at 1241–42 (differing and potentially costly paystub regulations); *Nat'l Ass'n for the Adv. of Multijurisdictional Prac. v. Berch*, 773 F.3d 1037, 1046 (9th Cir. 2014) (state-by-state bar admission requirements); *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1154–55 (9th Cir. 2012) (limits on practices of ophthalmologists, optometrists and opticians). Because the complaint here does not plausibly allege the challenged licensing rules impose a "significant burden" on interstate commerce, the court need not reach the question whether the law's burdens clearly exceed its local benefits. *Nat'l Pork Producers*, 6 F.4th at 1033.

The parties debate the implications of their respective positions fiercely. The president of California's medical board frames the dispute in this case as fundamentally about whether California's medical licensing rules are good or bad for California patients and asks rhetorically whether that decision should be left to the experts and the "political process"? *See* Mot. at 10. Horowitz and McBride decry the state's laws because they force patients to travel to other states for specialist care when a simple video visit would suffice. *See* Opp'n at 1. Will California patients have fewer options or receive care from doctors with less relevant expertise, as they contend? *See id.* Or as the amicus brief proposes, would a national standard of care suffice? *See* Amicus Br. at 7–10. These are debates worth having and important questions to ask, but when the costs of a challenged policy are born primarily by the people who live within the state that imposes them, as appears to be the case here given plaintiffs' allegations in the complaint, courts should hesitate to "step in" and resolve a conflict that could be addressed "through the political process" in that state. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007) As the Supreme Court counsels, a court such as this should be loath to interfere.

The court grants the motion to dismiss claim one. The court cannot exclude the possibility an amended complaint could state a viable claim after revisions, clarifications or the addition of new factual allegations and therefore also grants leave to amend.

1       **B.**     **Privileges and Immunities Clause**

2       The complaint's second claim is similar to its first, but rather than the Commerce Clause, it rests on the Privileged and Immunities Clause. "Under the Privileges and Immunities Clause, '[t]he Citizens of each State [are] entitled to all Privileges and Immunities of Citizens in the several States.'" *McBurney v. Young*, 569 U.S. 221, 226 (2013) (alterations in original) (quoting U.S. Const., art. IV, § 2, cl. 1). "A challenge under the Privileges and Immunities Clause entails 'a two-step inquiry.'" *Marilley v. Bonham*, 844 F.3d 841, 846 (9th Cir. 2016) (en banc) (quoting *Sup. Ct. of Va. v. Friedman*, 487 U.S. 59, 64 (1988)). "At step one, the plaintiff bears the burden of showing that the challenged law 'fall[s] within the purview of the Privileges and Immunities Clause.'" *Id.* (alterations in original) (quoting *Friedman*, 487 U.S. at 64). That is, the plaintiff "must show that the challenged law treats nonresidents differently from residents and impinges upon a 'fundamental' privilege or immunity protected by the Clause." *Id.* (quoting *United Bldg. & Constr. Trades Council v. Camden*, 465 U.S. 208, 218 (1984)). "If the plaintiff makes the required step-one showing, at step two the burden shifts to the state to show that the challenged law is 'closely related to the advancement of a substantial state interest.'" *Id.* (quoting *Friedman*, 487 U.S. at 65).

For the reasons explained in the previous section, the complaint does not include allegations to show California's licensing laws treat residents and nonresidents differently. The Ninth Circuit has upheld equivalently neutral attorney licensing rules. *See Nat'l Ass'n for the Adv. of Multijurisdiction Prac.*, 773 F.3d at 1046 ("[T]he State of Arizona imposes the same bar admission requirements on its own citizens as it does on citizens of other states. If a citizen of Arizona is admitted to the bar in a state" without "reciprocity with Arizona, then the attorney is not eligible to be admitted to the Arizona Bar on motion, irrespective of the attorney's residency or citizenship status.").

The court grants the motion to dismiss claim two, with leave to amend if possible.

      **C.**     **First Amendment**

Plaintiffs' third claim rests on the First Amendment, which, via the Fourteenth Amendment, "prohibits laws that abridge the freedom of speech." *See Nat'l Inst. of Family &*

1  *Life Advocates* (*NIFLA*) *v. Becerra*, 585 U.S. 755, 766 (2018).  They allege California's licensing law violates that prohibition by preventing out-of-state doctors from speaking with patients and potential patients about whether they can treat those patients and the patients' "options," "progress," "concerns," "diagnoses," and "the aftereffects of any therapy administered."  *See* Compl. ¶¶ 82–86.

The Supreme Court has made clear the First Amendment does in fact protect speech of "professionals," such as medical doctors.  *NIFLA*, 585 U.S. at 767.  But the Court has long "upheld regulations of professional conduct that incidentally burden speech."  *Id.* at 769.  That is true of "state rules limiting lawyers' communication with potential clients, state regulations of malpractice by professionals, and the right of states to compel doctors performing abortions to provide information in the manner mandated by the State about the risks of this medical treatment."  *Tingley v. Ferguson*, 47 F.4th 1055, 1080 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 33 (2023) (quotation marks omitted) (citing *NIFLA*, 585 U.S. at 769; *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 449 (1978); *NAACP v. Button*, 371 U.S. 415, 438 (1963); and *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)).  When a state regulates "professional conduct," its "power is great," even though the "regulation may have an incidental effect on speech."  *Pickup v. Brown*, 740 F.3d 1208, 1225 (9th Cir. 2014) (emphasis omitted), *abrogated in part on other grounds by NIFLA*, 585 U.S. 755, *as discussed in Tingley*, 47 F.4th at 1073–77.  A court will uphold a law that regulates professional conduct in this way if it is "rationally related to [a] legitimate government interest."  *Tingley*, 47 F. at 1073 (quoting *Pickup*, 740 F.3d at 1232).

The allegations underlying plaintiffs' third claim describe professional conduct, that is, treatment, and not protected speech.  Doctors offer treatment when they tell their patients and potential patients about their options, their progress toward recovery, symptoms, concerns, diagnoses and the effects of their treatment with regard to information about the patient the doctors have learned.  *See* Compl. ¶¶ 83–85 (citing these types of speech).  As plaintiffs clarify, the state's license rule "is only applied if the conversation includes topics related to a particular patient's health care."  *Id.* ¶ 88.  McBride and Horowitz do not allege California prevents out-of-

13

state doctors from voicing their opinions about healthcare or any particular type of therapy or policy in general terms. For example, a patient could ask a doctor if the doctor conducts a particular hand surgery and the doctor could truthfully answer, without treating the patient and taking account of the patient's specific health circumstances. It is only when doctors, people who hold themselves out as experts in the treatment of medical conditions, consult with particular patients about that patient's care that the state steps in.

Because the state's licensing laws regulate conduct, the court must uphold those laws if they are "rationally related to a legitimate state interest." *Tingley*, 47 F.4th at 1078 (quoting *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 440 (9th Cir. 2018)). This is a "light burden." *Id.* at 1077 (quoting *Erotic Serv. Provider*, 880 F.3d at 440). California has a legitimate interest in protecting the physical well-being of its citizens. *See Pickup*, 740 F.3d at 1231. It also has a "compelling interest in the practice of professions within [its] boundaries." *Tingley*, 47 F.th at 1078 (alteration in original) (quoting *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975)). Requirements for minimum qualifications, education and licensing fees are rationally related to both of these purposes. "It is properly within the state's police power to regulate and license professions, especially when public health concerns are affected." *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1054 (9th Cir. 2000).

McBride and Horowitz emphasize doctors are not physically treating their patients when they speak with them on the phone or in a video call. *See* Opp'n at 13. As they put it, "radiation treatment cannot be performed over the telephone or through an internet video conversation." *Id.* They contend phone conversations and video calls are not "treatment," but "pure speech." But the president of the state's medical board explains the fault in this argument persuasively:

> [T]he doctor-patient communication that Plaintiffs categorize as "pure speech"—discussion of symptoms and diagnoses, addressing recovery and patient questions, and providing information—is a core component of medical practice that California has a substantial interest in regulating. Indeed, much like the sort of hands-on treatment that Plaintiffs are envisioning, these communicative aspects of practice can pose substantial risks of harm if the physician

14

>advises their patients in a professionally incompetent manner because they lack sufficient qualifications.

Reply at 8–9 (citations omitted). "States do not lose the power to regulate the safety of medical treatments performed under the authority of a state license merely because those treatments are implemented through speech rather than through scalpel." *Tingley*, 47 F.4th at 1064; *see also, e.g.*, *Nat'l Ass'n for Advancement of Psychoanalysis*, 228 F.3d at 1054 (upholding California's mental health licensing laws against similar challenge).

Even if McBride and Horowitz are correct and the state's licensing rules do regulate some pure speech, the result would be the same under the Circuit's decision in *Tingley*. In *Tingley*, the court held that "laws regulating categories of speech belonging to a 'long tradition' of restriction are subject to lesser scrutiny." 47 F.4th at 1079 (alteration omitted) (quoting *NIFLA*, 585 U.S. at 767). The Circuit also confirmed "[t]here is a long . . . tradition of regulation governing the practice of those who provide health care within state borders." *Id.* at 1080 (citing *Dent v. West Virginia*, 129 U.S. 114 (1889) and *Hawker v. People of New York*, 170 U.S. 189 (1898)). "From 'time immemorial,' we have recognized '[t]he power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud." *Id.* at 1083 (alteration in original) (quoting *Dent*, 129 U.S. at 122). "And '[f]ew professions require more careful' scrutiny than 'that of medicine.'" *Id.* (alteration in original) (quoting *Dent*, 129 U.S. at 122). "The health professions differ from other licensed professions because they *treat* other humans, and their treatment can result in physical and psychological harm to their patients." *Id.* (emphasis in original). "This is why there is a historical tradition of states restricting the medical practices health care providers can use, while not, for instance, forbidding architects from 'proposing buildings in the style of I.M. Pei' or preventing accountants from 'discussing legal tax avoidance techniques.'" *Id.* (quoting *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 867 (11th Cir. 2020)). For these reasons, the court dismisses the third claim.

As noted above, after the court took this matter under submission, plaintiffs filed a notice of the Fifth Circuit's opinion in *Hines v. Pardue*, 117 F.4th 769, "as supplemental authority for their First Amendment claim in this case." ECF No. 18. In *Hines*, a veterinarian challenged a Texas law that "require[d] veterinarians to establish a veterinarian-client-patient relationship (VCPR) before engaging in the practice of veterinary medicine." 117 F.4th at 773. This could be done only by physically examining the animal or visiting the place where the animal was kept. *Id*. The plaintiff in *Hines* did not treat or examine animals in person; he responded to emailed questions about his clients' animals, so he was subjected to a fine and discipline. *See id.* at 772. The Fifth Circuit found the law regulated speech, not conduct, because the plaintiff's emails to his clients were the only part of his practice covered by any regulatory response. *See id.* at 778. The court therefore employed intermediate scrutiny and barred enforcement of the Texas law. *See id.* at 778–85.

The court declines to follow the reasoning in *Hines* for three reasons. First, as summarized above, the Ninth Circuit has held in a precedential opinion, which this court must follow, that laws regulating the practice of medicine within state borders belong "to a 'long tradition' of restrictions" subject to "lesser scrutiny." *Tingley*, 47 F.4th at 1079 (alteration omitted) (quoting *NIFLA*, 585 U.S. at 767). Second, unlike the Texas law at issue in *Hines*, California's law does not require in-person treatment, and it is about the treatment of people, not animals. For those reasons, the Fifth Circuit's assessment of the state's interests and justifications in *Hines* is unhelpful. Third, the Fifth Circuit's reasoning is unpersuasive on its own terms. It held the Texas law regulated speech, not conduct, because the law "*only* kicked in when [the plaintiff] began to share his opinions with his patients' owner." 117 F.4th at 778 (emphasis in original). But the communication is the service in question. Clients come to veterinarians with the expectation that those veterinarians will communicate their diagnoses and advice, not that they will form professional opinions but keep them to themselves—or begin the treatment without further discussion. The same is true of doctors, lawyers and many others who provide professional services to specific patients or clients. In this way, the Fifth Circuit's reasoning

16

lacks a workable limiting principle.  It effectively defines every professional service as speech warranting heightened scrutiny.

It may be that California has no legitimate interest in regulating some types of communications between doctors and patients or potential patients.  *Cf.* Opp'n at 17–18 (collecting authority showing First Amendment claims are often intensely factual).  There may be a viable distinction to be made between speech that is "treatment" and other speech that is not, but the current complaint does not offer allegations necessary to make any such viable distinctions.  The court therefore dismisses the third claim, with leave to amend if possible.

### III. CONCLUSION

The motion for leave to file an amicus brief is **granted**.  The motion to dismiss is **granted with leave to amend**.  Any amended complaint must be filed **within twenty-one days**.

This order resolves ECF Nos. 10 and 12.

IT IS SO ORDERED.

DATED: November 18, 2024.

SENIOR UNITED STATES DISTRICT JUDGE